UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

        v.

DONTA DIXON,

        Defendant.

20 Cr. 368 (NSR)

**Oral Argument Requested**

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT DONTA DIXON'S MOTION TO SUPPRESS

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 3

FACTUAL BACKGROUND............................................................................................... 3

ARGUMENT........................................................................................................................ 7

   I.  ALL EVIDENCE RECOVERED FROM DIXON SHOULD BE SUPPRESSED BECAUSE HIS FOURTH AMENDMENT RIGHTS WERE VIOLATED ............................................. 7

      A. The YPD Officers Lacked Probable Cause to Arrest Dixon ......................................... 7

      B. The YPD Officers Lacked Reasonable Suspicion to Stop and Search Dixon ................ 9

   II.  ALL STATEMENTS FROM DIXON FOLLOWING THE ILLEGAL STOP, SEARCH, AND ARREST ALSO SHOULD BE SUPPRESSED ......................................................... 12

   III. AT A MINIMUM, THE COURT SHOULD CONDUCT AN EVIDENTIARY HEARING TO RESOLVE THE FACTUAL DISPUTES IN THIS CASE............................................ 14

CONCLUSION.................................................................................................................... 15

Defendant Donta Dixon ("Dixon") respectfully submits this Memorandum of Law in support of his pre-trial motion pursuant to Federal Rule of Criminal Procedure 12(3)(c) to suppress physical evidence and statements made following his arrest.

## PRELIMINARY STATEMENT

Dixon has been charged in a one-count Indictment with possession of a firearm following a felony conviction, in violation of 18 U.S.C. § 922(g)(1). The physical evidence recovered from Dixon's person, including a firearm, ammunition, and an iPhone, was obtained following the stop, search, and arrest of Dixon while he was simply walking on a street in Yonkers, New York. Because the police officers that stopped Dixon had no legal basis to seize, search, and subsequently arrest Dixon, any evidence recovered from the search, including but not limited to the firearm, ammunition, Dixon's iPhone, and any DNA evidence obtained from the firearm or Dixon, or any statements made by Dixon following the stop and arrest must be suppressed.

## FACTUAL BACKGROUND

Dixon was arrested by plain clothes officers of the Yonkers Police Department ("YPD") in the early evening of May 29, 2020 on Hudson Street between Riverdale Avenue and South Broadway in Yonkers, New York. (*See* Declaration of Joseph Facciponti ("Facciponti Decl."), YPD Incident Report, Ex. B).

On May 29, 2020, Dixon left his girlfriend's residence at 75 Ludlow Street in Yonkers, New York at approximately 5:00 p.m. (*See* Declaration of Donta Dixon ("Dixon Decl.") ¶ 5, attached as Ex. A to the Facciponti Decl.)[1]. When he left his girlfriend's residence, Dixon was

---

[1] As noted in the Facciponti Decl., with consent of the Government, counsel for Dixon has filed an unsigned version of the Dixon Decl. because we did not receive the signed declaration from Westchester County Jail, where Dixon is currently housed, in time to file the present motion. (Facciponti Decl. ¶¶ 4-6). Dixon has reviewed the declaration and has represented to his attorneys that he has signed the Declaration and placed it in the mail to the

wearing black jeans with a white tank top. (*Id.* ¶ 6).  Additionally, Dixon was wearing an orange Nike cross-body bag across his torso with the front of the bag laying across his chest. (*Id.*; *see also* Ex. 1 to Dixon Decl.).

After leaving 75 Ludlow Street, Dixon began walking west on Ludlow Street towards Riverdale Avenue. (Dixon Decl. ¶ 7).  As he walked, Dixon listened to music on his iPhone with a pair of wired earbuds. (*Id.* ¶ 8).  After stopping at a deli on the corner of Riverdale Avenue and Ludlow Street to purchase cigarettes, Dixon began walking north on Riverdale Avenue towards the bus stop near Main Street and Broadway in Yonkers in order to take the No. 6 bus back to Dixon's residence in White Plains, New York. (*Id.* ¶¶ 9-10).

A YPD plain clothes officer ("Sgt. Schwartz ")[2] stationed near Cerrato Park in Yonkers saw Dixon walking north on Riverdale Avenue. (Facciponti Decl., Ex. B).  Sgt. Schwartz observed Dixon wearing an orange cross-body bag "slung over his left shoulder and around his torso[]" and believed the cross-body bag to contain a "heavy object inside, which appeared to be swinging freely causing the pouch to move about his person, and [Dixon] frequently adjusted it." (*Id.*).  Unlike the allegations in the Complaint, Sgt. Schwartz did not report that Dixon "peered into [the cross-body bag]". (*Compare* Complaint ¶ 3(c); Facciponti Decl., Ex. B).  As Dixon walked north on Riverdale Avenue, he saw multiple police cars with their sirens on driving south

---

undersigned. (*Id.*).  Dixon's counsel intends to file the signed Declaration as soon as it is received. (*Id.*).

[2] Sgt. Schwartz is not Officer-1 as described in the Complaint, 20 Mag. 5612 (Dkt No. 2) ("Complaint").  While the Complaint alleges that "a YPD police officer in plain clothes" described as "Officer-1" and his partner, who eventually made the arrest, first observed Dixon walking north on Riverdale Avenue prior to when a marked police car passed Dixon while driving south on Riverdale (Complaint ¶ 3), the YPD Incident Report (Facciponti Decl., Ex. B) reveals that it was a Sgt. Schwartz who first saw Dixon walking north on Riverdale Avenue near Cerrato Park, and that Sgt. Schwartz "advised" the two officers referenced in the Complaint about Dixon's movements. (*Id.*).

on Riverdale Avenue. (Dixon Decl. ¶ 13). Dixon turned around to watch the police cars as they passed him on Riverdale Avenue and then Dixon continued walking north on Riverdale Avenue. (*Id.*).

Sgt. Schwartz claimed that when the YPD police car drove past Dixon, he observed Dixon quickly grasp his cross-body bag and begin "taking hesitant strides, as if he were going to alter his direction of travel based on the marked police car's movement[.]" (Facciponti Decl, Ex. B). Sgt. Schwartz then advised two other plain clothes YPD officers ("Officer Fico" and "Officer Greene") of his observations and Officer Fico and Officer Greene began observing Dixon at Riverdale Avenue and Prospect Street. (*Id.*). Officer Fico and Officer Greene allegedly observed Dixon "look down and adjust the fanny pack and then look around nervously." (*Id.*). Once again, Officer Fico and Officer Greene did not report observing Dixon looking *into* his cross-body bag, as alleged in the Complaint. (*Id.*).

At approximately 5:30 p.m., as Dixon walked north on Riverdale Avenue and neared Hudson Street, he began to walk across a parking lot on the right side of Riverdale Avenue as a short cut. (Dixon Decl. ¶ 14). When Dixon began walking on Hudson Street, an unmarked car drove up to his left side, and Dixon observed a number of people, who he later learned were plainclothes YPD police officers, jump out of the car. (*Id.* ¶ 15). Dixon heard the police officers yell out "What was in the bag!" (*Id.* ¶ 16). Dixon took a step back and then one of the officers pushed him against the wall and placed Dixon's hands behind his back. (*Id.* ¶ 17). After Dixon was pushed up against the wall, the other officer took off Dixon's orange cross-body bag, and took Dixon's iPhone out of his hand. (*Id.* ¶ 18). As one officer placed Dixon in handcuffs, the other officer began searching Dixon's orange Nike cross-body bag. (*Id.* ¶ 20).

5

Officer Fico and Officer Greene found a firearm with a gray slide and a black grip within the cross-body bag. (Complaint ¶ 3(h)). The officers then placed Dixon under arrest and transported him to the YPD. (*Id.* ¶ 3(i)). According to the YPD Incident Report, Dixon "spontaneously uttered how he came into possession of the firearm." (Facciponti Decl., Ex. B). Following his arrest on May 29, 2020, Dixon was interviewed by several YPD officers. (Complaint ¶ 5). Dixon was advised of his *Miranda* rights and signed a *Miranda* card at 7:42 p.m. on May 29, 2020. (Facciponti Decl., Ex. C). According to the Complaint, during the interview, Dixon in sum and substance described how and where he purchased the firearm.

On June 1, 2020, Dixon made his initial appearance in front of Magistrate Judge Davison. (Dkt No. 5). Dixon was indicted on July 21, 2020 on one count of a felon in possession of a firearm in violation of Title 18, United States Code, Section 922(g)(1)(2). (Dkt No. 12). The Government informed the undersigned on August 4, 2020 that the YPD does not use body cameras, and thus no body camera footage of Dixon's stop, search, and arrest exists. (Facciponti Decl. ¶¶ 9-10). The Government also informed the undersigned that no City of Yonkers' camera covered the vicinity of Dixon's stop, search, and arrest and thus there was no surveillance video. (*Id.*).

Dixon now moves to suppress the firearm and ammunition recovered from the orange Nike cross-body bag, any evidence recovered from his iPhone on the date of his arrest, any DNA evidence obtained from the firearm or Dixon, as well as any post-arrest statements Dixon made after he was illegally searched and seized.

**ARGUMENT**

I. **ALL EVIDENCE RECOVERED FROM DIXON SHOULD BE SUPPRESSED BECAUSE HIS FOURTH AMENDMENT RIGHTS WERE VIOLATED**

The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  While police officers may conduct warrantless searches of an individual's personal property if the search is incident to a lawful custodial arrest, if "officers [lack] probable cause to arrest a suspect [they] necessarily lack probable cause to conduct a search incident to that arrest." *United States v. Valentine*, 539 F.3d 88, 96 (2d Cir. 2008). Furthermore, under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer may briefly seize an individual for "investigative purposes" if the officer 'has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. at 30).  Here, the YPD Officers who stopped, searched, and arrested Dixon lacked (i) probable cause to arrest Dixon and conduct a search incident to arrest and (ii) any reasonable suspicion to conduct a *Terry* stop and frisk of Dixon.

A. **The YPD Officers Lacked Probable Cause to Arrest Dixon**

A police officer has probable cause to arrest someone when the officer has "reasonably trustworthy information as to [the] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (internal quotation omitted).  When courts assess whether a police officer had probable cause to arrest, they consider "whether the facts known by the arresting officer at the time of the arrest objectively provided cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006).  "[P]robable cause means more than bare suspicion …[a]nd it certainly means more than suspicion of some generalized

7

misconduct: no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal citations and quotation marks omitted).

Here, the YPD Officers unquestionably arrested Dixon. (*See* Dixon Decl. ¶¶ 15-20; Facciponti Decl., Ex. B (YPD Incident Report); *see also* Complaint). Two YPD Officers stopped Dixon, placed him in handcuffs, and transported him to a YPD police station. (*Id.*; *see also* Facciponti Decl., Ex. B ("[Officer] Greene placed the male into custody without incident[.]"). Officer Fico's and Officer Greene's actions unquestionably constituted an arrest under established law.[3]

Because Dixon was arrested, the YPD Officers needed probable cause to conduct the arrest. *See Jaegly*, 439 F.3d at 153. They did not have it. "[P]robable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal citation and quotation marks omitted).

The Complaint does not allege any facts or circumstances to warrant a belief that Dixon had committed or was about to commit any offense. Instead, the Complaint alleges that the YPD

---

[3] While this was a formal arrest, it was also a *de facto* arrest. The Second Circuit applies a two-step objective test to determine whether such a seizure occurs: (1) would a reasonable person in the defendant's position understood that they were free to leave; and (2) was there a restraint of freedom of movement akin to that associated with a formal arrest. *See United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018). Here, what occurred to Dixon more than satisfies the two-pronged standard. The two YPD Officers in plain clothes jumped out of their unmarked car and within seconds had placed Dixon up against a wall with his hands behind his back, and applied hand cuffs to Dixon. (Dixon Decl., ¶¶ 15-19).

Officers observed Dixon repeatedly adjusting and looking into his cross-body bag[4] and that the Officers believed the bag contained a "heavy object"). (Complaint ¶¶ 3(b)-(d)).  Further, the Complaint alleges that the Officers observed Dixon attempt to "shield" his bag from a patrol car driving south on Riverdale Avenue and from Officer-2 and Officer-3. (*Id.* ¶¶ 3(e)-(g)).  These observations do not rise to the level of probable cause that a crime has been committed. *See e.g.*, *United States v. Jarvis*, 18 Cr. 475 (PAC), 2019 WL 1932758, at *3-4 (S.D.N.Y. Apr. 30, 2019) (finding officers lacked probable cause to arrest defendant where officers alleged that defendant adjusting waistband or walking away from police after being asked to stop).[5]   Instead, the YPD Officers acted on an "inchoate and unparticularized suspicion or 'hunch'" that Dixon's cross-body bag contained a weapon. *Terry v. Ohio*, 392 U.S. at 28.  That does not give rise to probable cause that a crime has been committed.  Because the YPD lacked any probable cause to seize and arrest Dixon, the evidence discovered after their illegal search should be suppressed.

        **B.**       **The YPD Officers Lacked Reasonable Suspicion to Stop and Search Dixon**

If the Government argues that YPD Officers conducted a *Terry* stop and frisk that later rose to an arrest, the Court should reject that argument and grant Dixon's motion to suppress because the YPD Officers lacked a reasonable basis to conduct a *Terry* stop.  Under *Terry*, a police officer can briefly seize an individual "for investigative purposes," if the officer "has a

---

[4] Even though the Complaint alleges that "Officer-1 watched as [Dixon] adjusted the fanny pack, peered into it, then looked over his shoulder[,]" Officer Fico's Incident Report makes no mention of anyone observing Dixon peering into his cross-body bag. (*Compare* Complaint ¶ 3(c) with Facciponti Decl., Ex. B).

[5] *See e.g. United States v. Dorlette*, 706 F. Supp. 2d 290, 303 n.7 (D. Conn. 2010) ("The Second Circuit has never held a suspect's mere digging into his pockets can give rise to reasonable suspicion."); *cf. People v. Fernandez*, 87 A.D.3d 474, 476 (1st Dep't 2011) ("The fact that defendant's hand was near his waistband or in his sweatshirt pocket, absent any indication of a weapon, *such as the visible outline of a gun*, did not create a reasonable suspicion that defendant had committed or was about to commit a crime.") (emphasis added).

reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Sokolow*, 490 U.S. at 7 (citing *Terry v. Ohio*, 392 U.S. at 30). After an officer stops an individual he reasonably suspects is engaged in criminal activity, the officer may question that individual only for a limited period of time. *Terry*, 392 U.S. at 21. Only if the officer reasonably believes the individual to be "armed and presently dangerous," may the officer "conduct a carefully limited search of the outer clothing." *Id.* An officer must have more than "inchoate and unparticularized suspicion or hunch" to conduct a *Terry* stop. *Sokolow*, 490 U.S. at 7. They must be able to point to "specific and articulable facts" to support their reasonable suspicion of criminal activity." *Terry*, 392 U.S. at 21.

Courts assess the totality of the circumstances to determine whether there was reasonable suspicion for a *Terry* stop and frisk at its inception, analyzing it from the perspective of an objectively reasonable officer and considering the information known to the officer who conducted the stop. *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006).

Here, the YPD Officers lacked any articulable facts to justify a reasonable suspicion that Dixon was involved in criminal activity. As discussed above, the Complaint did not allege nor are there any facts to claim that Dixon had committed a crime. Dixon was simply walking north on Riverdale Avenue heading to the bus stop in order to leave Yonkers and head home to his residence in White Plains. (Dixon Decl., ¶ 10). Officer Fico's allegations that Dixon's cross-body bag contained a "heavy object," that Dixon repeatedly adjusted, and shifted his body to allegedly "shield the fanny pack from view" are not sufficient to rise to the level of reasonable suspicion that Dixon had engaged in criminal activity or was armed and dangerous. *See Jarvis*, 2019 WL 1932758, at *3 (finding that officer did not have reasonable suspicion to conduct a *Terry* stop where defendant allegedly continued walking after officer announced himself and

defendant adjusted his waistband); *see also United States v. Jackson*, 15 Cr. 106 (JPO), 2015 WL 4557401, at *7-9 (S.D.N.Y. July 29, 2015).

*Jackson* is an apt comparison to the facts alleged in the Complaint. In *Jackson*, police officers stopped Jackson after he entered a closed park at 10:00 p.m., and shortly thereafter frisked him and discovered two firearms in Jackson's jacket. The officer in *Jackson* alleged that Jackson was (i) nervous when stopped by the officers; (ii) stopped in a moderately high-crime area at night; and (iii) holding his jacket in his arms in such a way to create the appearance of a lump or bulge. *Jackson*, 2015 WL 4557401, at *8. The court in *Jackson* found that such allegations were not sufficient to create a reasonable suspicion that Jackson was armed and dangerous. *Id.*, at 8-10. Furthermore, the court found that the Court was "unable to find that Jackson did anything consistent with trying to access or conceal a firearm[,]" where Jackson did not refuse to follow police instructions, nor did the officers allege that there was any suspicion of a violent crime in progress. *Id.* at 9.

In this case, Dixon was simply walking down the street, in daylight, with a bag slung across his body. He was approached by two plainclothes YPD Officers who immediately screamed at him "What['s] in the bag!" (Dixon Decl., ¶ 16). Dixon responded by taking a step back – hardly a suspicious act for someone who is yelled at on the street by two unknown persons. (*Id.* ¶ 17). Before Dixon was given a chance to respond, he was pushed up against a wall, handcuffed, and his cross-body bag removed and searched. (*Id.* ¶¶ 18-19). At no point did Dixon refuse a police instruction. (*See* Facciponti Decl., Ex. B ("[Officer] Greene placed the male in custody without incident[.]")).

Furthermore, the allegation that Dixon's cross-body bag contained a "heavy object" is not sufficient to justify a reasonable suspicion that Dixon was armed and dangerous where the YPD

11

Officers have not alleged any facts about the size, shape, and placement of the object to justify the conclusion that the object was a weapon. *See Jackson,* 2015 WL 4557401, at *11. The presence of a heavy object in a cross-body bag should not be sufficient to warrant a stop and frisk, especially where such an object could have been anything beyond a firearm, for example a camera or a bottle filled with water. *See e.g.*, *Jackson*, 2015 WL 4557401, at *9 ("there is no testimony to support the proposition that the bulge was not a perfectly ordinary thing to see in a jacket worn by a person whose arms were raised in the manner described here.").

Because the YPD Officers failed to particularize any facts to create a reasonable suspicion that Dixon was engaged in criminal activity at the time they stopped Dixon nor any basis for believing that Dixon was armed and dangerous, Dixon respectfully requests that the Court suppress all evidence seized from the illegal stop and frisk, including but not limited to the firearm and ammunition recovered, any evidence obtained from Dixon's iPhone, and any DNA evidence obtained from the firearm or Dixon.

## II. ALL STATEMENTS FROM DIXON FOLLOWING THE ILLEGAL STOP, SEARCH, AND ARREST ALSO SHOULD BE SUPPRESSED

The exclusionary rule "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search[.]" *Murray v. United States*, 487 U.S. 533, 536-537 (1988). Under the exclusionary rule, any statements made by Dixon following his illegal stop, search, and arrest (Complaint ¶ 5; Facciponti Decl., Ex. B) should be suppressed as the tainted fruit of the Fourth Amendment violations described above. *See, e.g., Brown v. Illinois*, 422 U.S. 590, 605 (1975); *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

Tainted evidence may be admissible at trial if the Government can show that the causal connection between the evidence and the unlawful conduct has "become so attenuated as to

12

dissipate the taint." *Wong Sun*, 371 U.S. at 487. When evaluating whether incriminating statements are sufficiently attenuated from an unlawful statement, courts consider the following factors: (i) the temporal proximity of the arrest and confession; (ii) the presence of intervening circumstances, and (iii) the purpose and flagrancy of the official misconduct. *See Brown*, 422 U.S. at 603-604. In *Brown*, the Supreme Court ruled that a defendant's confession, obtained two hours after an illegal arrest and after receiving *Miranda* warnings, was inadmissible because there were "no intervening event of significance" and that attenuation between the unlawful arrest and the defendant's confession was not shown. *Id.,* at 604-05; *see also Dunaway v. New York*, 442 U.S. 200, 217 (1979) (suppressing defendant's statements made after arrest without probable cause despite subsequent *Miranda* warnings because "[no] intervening events broke the connection between [defendant's] illegal detention and his confession."); *Taylor v. Alabama*, 457 U.S. 687, 690-91 (1982) (reaffirming *Brown* and *Dunaway* and suppressing a confession given six hours after an unlawful arrest because there was no intervening circumstances).

Here, Dixon was illegally stopped, searched, and arrested by YPD Officers at approximately 5:30 p.m. on May 29, 2020. (Complaint ¶ 3). Dixon was then transported to a YPD station. (*Id.* ¶ 3(i)). Dixon was not given a *Miranda* warning after his arrest and during his transport to the YPD station. At approximately 7:42 p.m., Dixon was given a *Miranda* warning and he signed a *Miranda* card. (Facciponti Decl., Ex. C). Although not cited in the Complaint, Dixon's spontaneous utterance, as noted in the YPD Incident Report (Facciponti Decl, Ex. B), should be suppressed because it occurred almost immediately after his illegal arrest and unreasonable search of his cross-body bag, thus there was no intervening circumstances to dissipate the taint of that search. *See e.g., United States v. Wright*, 856 F. Supp. 2d 736, 750

13

(E.D.N.C. 2012).  Additionally, similar to the circumstances of *Brown v. Illinois*, Dixon was interviewed only two hours after his arrest, and although he was given a *Miranda* warning, there were no intervening circumstances between Dixon's illegal search, seizure, and arrest, and Dixon's statements, therefore any statements made by Dixon or evidence obtained post-arrest, including the bullets and any DNA evidence, following his arrest on May 29, 2020 should be suppressed as fruit of the unlawful stop, search, and arrest.

### III. AT A MINIMUM, THE COURT SHOULD CONDUCT AN EVIDENTIARY HEARING TO RESOLVE THE FACTUAL DISPUTES IN THIS CASE

There are important factual disputes here as to the YPD Officers' basis for stopping, arresting, and searching Dixon.  The Complaint and YPD Incident Report differ as to who initially observed Dixon walking north on Riverdale Avenue – the Complaint alleges that the arresting Officers surveilled Dixon the entire time – whereas Officer Fico's Incident Report makes clear that another separate plain clothes officer, Sgt. Schwartz, originally observed Dixon walking north on Riverdale Avenue. (*Compare* Complaint ¶ 3(b) with Facciponti Decl., Ex. B). Further, while the Complaint alleges that Dixon repeatedly "peered into [his cross-body bag]," Officer Fico's Incident Report makes clear that neither Sgt. Schwartz, Officer Fico, nor Officer Greene observed Dixon peering into his cross-body bag. (*Compare* Complaint ¶ 3(c) with Facciponti Decl., Ex. B).  Additionally, Dixon's statements directly contradict the allegations in the Complaint, which is not alleged by Sgt. Schwartz, Officer Fico, or Officer Greene, the three officers involved in the search, seizure, and arrest of Dixon, but instead from an FBI Task Force Officer who was not personally involved in Dixon's arrest. (*Compare* Dixon Decl. ¶¶ 11-20 with Complaint ¶¶ 2, 3(a)-(i)).  Dixon also notes that none of the YPD Officers' statements can be corroborated via body camera footage or any other contemporary video footage. (Facciponti Decl., ¶¶ 9-10).

14

At the very least, the Court should conduct a hearing to resolve these factual disputes. *See United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992); *see also United States v. Noble,* 07 Cr. 284, 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008). Dixon respectfully requests the opportunity to submit additional briefing regarding all relevant legal issues following an evidentiary hearing.

## CONCLUSION

For all the foregoing reasons, Dixon respectfully requests that the Court grant his motion to suppress the physical evidence recovered from his person including but not limited to the firearm, ammunition, iPhone, and any DNA evidence obtained from the firearm or Dixon, after he was unlawfully stopped, searched, and arrested as well as to suppress all statements made by Dixon after his unlawful arrest on May 29, 2020. Dixon respectfully requests that the Court hold an evidentiary hearing to resolve any factual disputes. Dixon also respectfully requests the opportunity to submit additional legal briefing following an evidentiary hearing, if the Court determines a hearing is necessary.

Dated:  New York, New York
        November 30, 2020

                                    Respectfully submitted,

                                    MURPHY & MCGONIGLE, P.C.

                                    By:  /s/ Joseph Facciponti
                                    Joseph P. Facciponti
                                    jfacciponti@mmlawus.com
                                    Gaurav K. Talwar
                                    gtalwar@mmlawus.com

                                    1185 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 880-3976
                                    *Attorneys for Defendant
                                    Donta Dixon*

15

TO: Audrey Strauss, ESQ.
United States Attorney
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

ATTN: AUSA Lindsey Keenan, Esq.