USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __1/12/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-                                        20-CR-368 (NSR)

DONTA DIXON,                                    ORDER AND OPINION

                                    Defendant.

Nelson S. Román, United States District Judge:

Defendant Donta Dixon ("Defendant") is charged in a one count indictment with violating 18 U.S.C. § 922(g)(1) and (2). Defendant now moves to suppress (1) physical evidence recovered from Defendant's person on May 29, 2020 including a firearm, ammunition, and an iPhone, (2) all post-arrest statements on the basis that the Yonkers Police Department ("YPD") officers (a) lacked probable cause to arrest him, and (b) lacked reasonable suspicion to stop and search him, and all statements were obtained following an unlawful stop, search, and arrest. The Government argues that (1) the YPD had reasonable suspicion to stop Dixon, (2) YPD arrested the Defendant on probable cause, and (3) the post-arrest statements should not be excluded. Defendant requests an evidentiary hearing, which the Government argues is unnecessary. For the reasons that follow, the Court GRANTS Defendant's motion to the extent of setting the matter for an evidentiary hearing to determine whether the police officers' stop and subsequent search of the Defendant, resulting in the discovery of physical evidence, was lawful, and whether Defendant's statement enroute to the station was spontaneous or the subject of a custodial interrogation.

## BACKGROUND

### I.    Factual Background

The following facts are drawn from the criminal complaint filed in this matter ("Complaint") (ECF No. 2), the indictment (ECF no. 12), and the parties' submissions.

### A.  Defendant's Account of the Stop, Search, & Arrest

Defendant avers that he left his girlfriend's apartment around 5:00 p.m. on May 29, 2020 with an orange Nike cross-body bag across his torso. (Decl. of Donta Dixon ("Dixon Decl.") (ECF No. 29) ¶¶ 5-6). As he walked, he was listening to music on his iPhone using wired earbuds. (*Id.* ¶ 7.) He stopped at a deli and purchased loose Newport cigarettes, which he placed in his orange Nike cross-body bag. (*Id.* ¶ 9.) As he walked he continued listening to his music and he does "not recall looking into [his] cross-body bag, but if [he] did, [he] believe[s] [he] would have looked for the Newport cigarettes [he] had purchased." (*Id.* ¶ 12.) He "walked north on Riverdale Avenue, saw multiple police cars driving very fast, heading south on Riverdale Avenue with their sirens on. [He] turned to watch the police cars as they passed and then continued walking north on Riverdale Avenue." (*Id.* ¶ 13.) As he "approached Hudson Street on Riverdale Avenue, [he] began to cut through a parking lot on the right side of Riverdale Avenue to get to Hudson Street and then to the bus stop," and when he "began walking on Hudson Street, [he] saw an unmarked car drive up to the left side of [him] and saw a number of people jump out of the car" who he later learned were plainclothes YPD police officers. (*Id.* ¶¶ 14-15.) "The YPD police officers immediately began yelling at [him] 'What was in the bag!'" (*Id.* ¶ 16.) He avers that he "took a step back and then a YPD police officer pushed [him] face first against a wall with [his] hands behind [his] back" and "another YPD police officer took off [his] orange Nike cross-body bag, and then took [his] iPhone from [his] hands." (*Id.* ¶ 18.) "While one YPD officer placed [him] in handcuffs, the other YPD officer began searching [his] orange Nike cross-body bag." (*Id.* ¶ 19.)

### B.  The Government's Account of the Stop, Search, & Arrest

The police incident report regarding Defendant's arrest states:

On Friday, 05/29/2020, 3rd Precinct ACU Officers Fico/Greene/Sgt. Schwartz were utilizing plainclothes and unmarked police vehicles to conduct patrol activities. Sgt.

Schwartz, while in the area of Cerrato Park, observed [Defendant or "the male"] walking northbound on the sidewalk bordering Cerrato Park . . . . [wearing] an orange fanny pack slung over his left shoulder and around his torso. The fanny pack appeared to be weighed down by a heavy object inside, which appeared to be swinging freely causing the pouch to move about his person, and the male frequently adjusted it. As Lieutenant Lacey was driving a marked radio car (R/C 312) southbound on Riverdale Av, Sgt. Schwartz watched the male observe the radio car and quickly grasp the fanny pack and begin taking hesitant strides, as if he were going to alter his direction of travel based on the marked police car's movement, further he continued to look over his shoulder to maintain visual contact of the radio car. Sgt. Schwartz advised us of his observations and we began observing the same male at Riverdale Av and Prospect St. We watched the male travel through the Hudson St. Municipal Parking Lot on the northeast end of the Riverdale/Prospect intersection. While observing the male, we saw him look down and adjust the fanny pack and then look around nervously. The male then turned eastbound on Hudson St and began walking towards South Broadway while continuing to nervously glance over each shoulder. We exited our vehicle and approached the male to conduct a field interview in front of 2 Hudson St. We immediately identified ourselves as Yonkers Police Officers and our shields were visible to the public. 4th Precinct ACU Officers Reda/M. Giusto were now accompanying us and identified themselves as Yonkers Police Officers as well. When we approached the male, his eyes widened, he took a step backwards (away from us) and then bladed the right side of his body away from us as if to conceal the pouch of the fanny pack. Fearing that the male was in possession of a weapon, P.O. Greene grabbed the exterior of the fanny pack and felt a heavy object that due to the the [sic] weight and shape, he knew to be consistent with a firearm. P.O. Greene placed the male into custody without incident and the male identified himself as (SA) Donta Dixon. P.O. Greene then removed the fanny pack from the male and turned it over to me. I then opened the fanny pack and observed a firearm with a gray slide and black grip; subsequently removed the firearm to confirm it was not an imitation weapon; slightly pulled the slide back to confirm whether or not it was loaded, saw the brass casing of a bullet, and placed the firearm back into the fanny pack without cycling or tampering with the battery of the weapon.

(Ex. B to Facciponti Decl. ("Report") (ECF No. 27-2).)

In the Complaint, Brian Menton, a Task Force Officer with the Federal Bureau of

Investigation who interviewed the arresting officers avers:

    a. On or about May 29, 2020, police officers from the YPD 3rd Precinct anti-crime unit were on duty in the vicinity of Joseph Cerrato Park, in Yonkers, New York.

    b. At approximately 5:20 p.m., on or about May 29, 2020, a YPD police officer in plain clothes ("Officer-1") and his partner, were in an unmarked car near the corner

of Riverdale Avenue and Vark Street, when they observed an individual ("Individual-1") walking north on Riverdale Avenue.

c. According to Officer-1, Individual-1 had an orange fanny pack slung across his chest. Officer-1 watched as Individual-1 adjusted the fanny pack, peered into it, then looked over his shoulder. Individual-1 repeated this action several times while walking.

d. According to Officer-1, the fanny pack appeared to contain a heavy object, because each time Individual-1 adjusted the fanny pack, it slid back down his torso.

e. According to Officer-1, a marked YPD patrol car drove past Individual-1, and Individual-1 grabbed the fanny pack and shifted his body to shield the fanny pack from view of the patrol car.

f. According to Officer-1, he and his partner approached Individual-1 as Individual-1 turned right on Hudson Street. Officer-1 identified himself as a YPD officer, and pointed to the shield on his waist. Officer-1 stated, in substance and in part, "Yonkers Police, can we talk to you for a minute?"

g. According to Officer-1, as he approached Individual-1, Individual-1 grabbed the fanny pack, took a step backward, and turned his body to shield the fanny pack from view. Based on Individual-1's movements during the time they observed him, and the apparent weight of the object in the fanny pack, which settled at the bottom of the bag, Officer-1 believed the fanny pack may have contained a weapon.

h. According to Officer-1, his partner asked Individual-1, in substance and in part, if he had any weapons or drugs on his person. Individual-1 stated that he did not. For safety purposes, Officer-1's partner conducted a pat down of Individual-1, and identified the object in the fanny pack as a gun.

i. According to Officer-1, after finding the gun he placed Individual-1 under arrest, and transported him to the YPD.

(Complaint at 2-3.)

### C. Post-Arrest Statements

According to the police report, "R/C 3H (Vieira/J. Menton) transported Donta to the Detective Division, where, at approximately 1747hrs, he spontaneously uttered how he came into possession of the firearm." (Report.) Defendant signed a Miranda waiver card at 7:42 P.M. on May 29, 2020. (Ex. C to Facciponti Decl. ("Miranda Card") (ECF No. 27-3).)

The Complaint states in relevant part that:

DIXON waived his *Miranda* rights, and agreed to speak to law enforcement officers. DIXON stated, in substance and in part, the following:

a. On or about May 29, 2020, DIXON contacted a friend on Snapchat, and arranged to purchase a gun. According to DIXON, he was directed to meet an unknown individual at Joseph Cerrato Park in Yonkers, New York, at 10:30 a.m.

b. DIXON paid $150 for the gun, which was delivered to him in the orange fanny pack.

c. DIXON stated that as he was leaving the park, he continuously unzipped the fanny pack to examine the gun, because he was concerned that the inexpensive price might mean the gun was defective.

(Complaint at 3.)

## II.     Procedural History

A sealed Complaint was signed by Magistrate Judge Lisa Margaret Smith on May 30, 2020. The Complaint was unsealed on June 1, 2020. On June 17, 2020, Magistrate Judge Lisa Margaret Smith granted bail. On July 21, 2020, the Government filed a one-count indictment charging Defendant with knowing that he had previously been convicted of a felony and nonetheless possessing a firearm—a Bryco Arms, model Jennings Nine, 9 millimeter pistol—which previously had been shipped and transported in interstate commerce in violation of 18 U.S.C. § 922(g)(1)-(2). (ECF No. 12.) On August 3, 2020, Defendant was arraigned on the indictment and entered a plea of not guilty. The initial conference before this Court was held on September 9, 2020, during which the Court granted Defendant leave to file the instant motion. Defendant filed the instant suppression motion on November 30, 2020. (ECF No. 26.) The Government filed its memorandum in opposition on December 21, 2020. (ECF No. 30.) Defendant filed his reply on January 4, 2021. (ECF No. 31.)

## LEGAL STANDARDS

### I.      Evidentiary Hearings

To defeat a suppression motion, "[t]he Government bears the burden of proof as to establishing probable cause" or reasonable suspicion, as the case may be. *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). The Government must make this showing "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (internal quotation mark omitted). A defendant may not rely on "bald assertions," and "[w]ithout specification of the factual basis" that supports suppression, "the district court is not required to have a hearing." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998); *see also United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) ("A hearing is not required if the defendant's statements are general, conclusory or based on conjecture."). Moreover, although the Government's reliance on "unsworn statements" in its Memorandum of Law may generally not be enough for a court to make a finding of fact, *see United States v. Marquez*, 367 F. Supp. 2d 600, 603 (S.D.N.Y. 2005), a defendant nevertheless bears the initial burden of establishing, by an affidavit of someone with personal knowledge of the underlying facts, that there are, in fact, disputed issues of material facts, *Viscioso*, 711 F. Supp. at 745 (citing *United States v. Caruso*, 684 F. Supp. 84, 87 (S.D.N.Y. 1998)). "[A]n attorney's affidavit, absent personal knowledge[,] is insufficient to justify a suppression hearing." *United States v. Cook*, 348 F. Supp. 2d 22, 28 (S.D.N.Y. 2004).

## II.        Reasonable Suspicion for *Terry* Stops

Law enforcement officers may initiate a consensual encounter with a private citizen in a public forum for any reason without violating the Fourth Amendment. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). A consensual encounter ripens into a detention or a seizure when, "under the circumstances, a reasonable person would have believed that he was not free to leave." *United States v. Peterson*, 100 F.3d 7, 10 (2d Cir. 1996).

Under *Terry v. Ohio*, 392 U.S. 1 (1968), "a police officer may briefly detain an individual for questioning if the officer has 'a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.'" *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008) (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). An officer has a reasonable suspicion when he or she is "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975). "[T]he amount of suspicion needed to justify the encounter is less than a 'fair probability' of wrongdoing, and 'considerably less than proof of wrongdoing by a preponderance of evidence.'" *Padilla*, 548 F.3d at 186-87 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "Moreover, such a stop must be 'justified at its inception.' Any events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." *United States v. Freeman*, 735 F.3d 92, 96 (2d Cir. 2013) (quoting *Terry,* 392 U.S. at 20).

To frisk a suspect who has been lawfully stopped, police officers must have reasonable suspicion that the suspect is armed and dangerous. *Terry,* 392 U.S. at 24; *United States v. Oates,* 560 F.2d 45, 61 (2d Cir. 1977). "Where officers have reasonable suspicion that the suspect has committed, or is about to commit, a violent or dangerous crime, the suspicion necessary to

justify a stop ordinarily justifies a frisk as well." *United States v. Jackson*, No. 15-CR-106 JPO, 2015 WL 4557401, at *7 (S.D.N.Y. July 29, 2015) (citing WAYNE R. LAFAVE, 4 SEARCH & SEIZURE § 9.6(a) nn.55–61 (5th ed. 2014) (collecting cases)).

The "reasonable suspicion" inquiry requires courts to "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Freeman*, 735 F.3d at 96 (emphasis omitted). Courts "evaluate this totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' [but may] 'not merely defer to the police officer's judgment." *Id.* (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) (internal quotation marks omitted)).

"[T]he apparent adjustment of a concealed firearm" coupled with factors such as presence in a high-crime area has been deemed a sufficient basis for an investigative stop. *United States v. Padilla*, 548 F.3d 179, 189 (2d Cir. 2008) (holding that defendant's body movement, which the arresting officer testified was "consistent with the adjustment of a concealed firearm" based on his "eight to ten arrests of armed individuals observed to make the same movement" conferred reasonable suspicion for stop and frisk); *accord United States v. Rodriguez*, 727 F. App'x 725, 728 (2d Cir. 2018) (holding that, despite innocent justifications provided by defense counsel, defendant's movements, which became suspicious when he continued them for a long time, "established an articulable suspicion of having a weapon in the waistband area of the trousers and the body"); *see also United States v. Dekattu*, No. 1:18-CR-0474, 2019 WL 1091384, at *5 (E.D.N.Y. Mar. 8, 2019) (finding reasonable suspicion where the defendant "was observed in a 'high crime area,' behaving nervously and appearing to carry a concealed firearm, and when the police approached him, he reacted in an agitated and evasive manner"). Similarly, the Second

8

Circuit has upheld a finding of reasonable suspicion based in part on a suspect "looking around nervously over his shoulders." *United States v. Glover*, 957 F.2d 1004, 1010 (2d Cir. 1992). "[W]here an officer has a reasonable basis to think that the person stopped poses a present physical threat to the officer or others, the Fourth Amendment permits the officers to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest."[1] *United States v. Newton,* 369 F.3d 659, 674 (2d Cir. 2004) (quoting *Terry*, 392 U.S. at 24). "This doctrine has supported a range of restraints incident to a stop, from the pat-down at issue in *Terry*, to the drawing of firearms, to the use of hand-cuffs." *Id.* (collecting cases).

### III.     Probable Cause to Arrest

Investigative stops can lead to lawful arrests where "the existence of a probable cause sufficient to support an arrest . . . develop[s] during the course of a stop based on reasonable suspicion." *Oates*, 560 F.2d at 62; *see also United States v. Brockington*, 378 F. App'x 90, 91 (2d Cir. 2010) ("reasonable suspicion may develop into probable cause based on events unfolding during an investigative stop" (citing *United States v. Vasquez,* 638 F.2d 507, 522 (2d Cir. 1980)). An officer has probable cause to arrest someone when the officer has "reasonably trustworthy information as to [the] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (internal quotation omitted). When courts assess whether a police

---

[1] In order to determine whether an alleged *Terry* stop has become a *de facto* arrest, courts consider

> the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was re-strained, and in particular such factors as the number of agents involved; whether the target of the stop was suspected of being armed; the duration of the stop; and the physical treatment of the suspect, including whether or not handcuffs were used.

*Oliveira v. Mayer*, 23 F.3d 642, 645 (2d Cir. 1994).

officer had probable cause to arrest, they consider "whether the facts known by the arresting officer at the time of the arrest objectively provided cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006). "[P]robable cause means more than bare suspicion . . . [a]nd it certainly means more than suspicion of some generalized misconduct: no probable cause exists to arrest where a suspect's actions are too ambiguous to raise more than a generalized suspicion of involvement in criminal activity." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal citations and quotation marks omitted).

## IV.    Post-Arrest Statements

Under *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[2] 384 U.S. 436, 444 (1966). "'[C]ustody' for Miranda purposes is not coterminous with . . . the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152-53 (2d Cir. 2011). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994); *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

---

[2] Specifically, under *Miranda*, law enforcement must "advise a suspect that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' " *United States v. Schaffer*, 851 F.3d 166, 173 n.23 (2d Cir. 2017) (quoting *Miranda*, 384 U.S. at 444).

Interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of an interrogation amounts to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from [a defendant]." *Id.* at 301. "Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect." *Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) (citing *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)).

By contrast, there is no interrogation where a defendant's statements "were not made in response to any purported questioning or its functional equivalent[.]" *United States v. Hashmi*, No. 06 CRIM. 442(LAP), 2009 WL 2496272, at *5 (S.D.N.Y. Aug. 7, 2009). A defendant's voluntary incriminating statements made while the defendant is in custody are admissible. *United States v. Compton*, 428 F.2d 18, 22 (2d Cir. 1970). A "spontaneous or volunteered utterance by a suspect, even though in custody . . . is not the product of custodial interrogation, and is thus not subject to suppression under *Miranda*." *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *15 (S.D.N.Y. Dec. 3, 2015) (citing *United States v. Colon*, 835 F.2d 27, 28, 30 (2d Cir. 1987)).

## V.    Exclusionary Rule

"Evidence obtained by exploitation of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'" *United States v. Morales*, 788 F.2d 883, 885 (2d Cir. 1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)). This exclusionary rule "reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015) (quoting *Segura v.*

*United States*, 468 U.S. 796, 804 (1984)). For evidence to be suppressed, it is not enough to establish that the evidence would not have been obtained "but for" the illegal search or seizure. *See United States v. Nayyar*, 221 F. Supp. 3d 454, 467 (S.D.N.Y. 2016). "Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 487-88 (internal quotation and citation omitted). In assessing whether a statement has been purged of taint, courts will consider, among other things, "whether a Miranda warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested [evidence], the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)).

## DISCUSSION

Defendant has moved to suppress various physical evidence and statements he made in the course of May 29, 2020 and has requested an evidentiary hearing to resolve factual disputes and discrepancies as to the YPD Officers' basis for stopping, arresting, and searching Defendant. The Court notes that the parties have presented two versions of the events that transpired on May 29, 2020. There are conflicting accounts as to whether the officers had reasonable suspicion to stop Defendant, whether there was a valid *Terry* stop or whether the stop and immediate seizure of Defendant constituted a *de facto* arrest, and when Defendant told officers how he came to possess the firearm in question after his arrest. In his declaration, Defendant avers in sum and substance that he was merely walking down the street in broad daylight with a bag slung across his body, was not acting suspiciously, and that the officers' first words to him were "What['s] in the bag!"

(Dixon Decl.) In other words, Defendant claims that the officers stopped and detained him without reasonable suspicion and arrested him immediately without giving him an opportunity to respond to their questions. The Government, in turn, claims that the officers had reasonable suspicion to stop Defendant because they observed him engaging in suspicious behavior including walking in a high-crime area; constantly adjusting and nervously looking into his bag, which appeared to contain a heavy object; and turning his body away as if to shield the bag from the view of officers in a marked police car he passed. The Government further contends that when he was approached by officers, Defendant stepped back and turned his body as if to conceal the bag that officers already suspected contained a weapon and that since they suspected that he had a weapon, they patted him down, identifying the object in the bag as a gun, and at that point, Defendant was arrested.

The Court finds that Defendant has sufficient personal knowledge of the events that transpired on May 29, 2020 and his account is "sufficiently definite, specific, detailed, and nonconjectural" to warrant an evidentiary hearing to determine whether the officers had reasonable suspicion to stop and probable cause to arrest Defendant, whether  Defendant's subsequent statements, while under arrest and in transit to the station, were spontaneous, and further, whether the statements subsequently made during a custodial interrogation were made after the Defendant waived his *Miranda* rights. *See Pena*, 961 F.2d at 339.

## CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is GRANTED to the extent of setting the matter for an evidentiary hearing to determine whether the police officers' stop and subsequent search of the Defendant, resulting in the discovery of physical evidence, was lawful, and whether Defendant's statement enroute to the station was spontaneous or the subject of a

custodial interrogation. The evidentiary hearing will be scheduled during the status conference scheduled for January 22, 2021 at 11:00 AM. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 26.

SO ORDERED.

Dated:   January 12, 2021
         White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge

14