USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___4/28/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

              -against-

DONTA DIXON,

                    Defendant.

20-CR-368 (NSR)
ORDER AND OPINION

Nelson S. Román, United States District Judge:

      Defendant Donta Dixon ("Defendant") is charged in a one count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (2). Defendant moved to suppress evidence the Yonkers Police Department ("YPD") obtained on May 29, 2020 when it stopped and searched him on the basis that, inter alia, the YPD lacked reasonable suspicion. (ECF No. 26.) The Court held an evidentiary hearing on March 2, 2021. Following the hearing, Defendant and the Government submitted memoranda. (ECF Nos. 38 and 39, respectively.) For the following reasons, Defendant's motion to suppress is GRANTED.

## BACKGROUND

### I.    Factual Background

      The Court assumes the parties' familiarity with the underlying facts. In brief, on May 29, 2020, Defendant was observed by Sergeant Schwartz, Officer Greene, and Officer Fico of the YPD walking in the area of Yonkers near Joseph Cerrato Park ("Cerrato Park") with a cross-body bag that appeared to contain a heavy object. Subsequently, the YPD officers forcibly detained Defendant, opened the bag, discovered a loaded firearm, and arrested Defendant.

## II.    Procedural History

On May 30, 2020, Magistrate Judge Lisa Margaret Smith signed a sealed complaint charging Defendant with a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (2). (ECF No. 2.) The Complaint was unsealed on June 1, 2020. On June 17, 2020, defense counsel reserved on bail and Defendant was detained without prejudice. (Minute Entry dated June 1, 2020.) Defendant's subsequent bail request application (ECF No. 8) was denied and Defendant remains in custody.[1]

On July 21, 2020, the Government filed a one-count indictment charging Defendant with knowing that he had previously been convicted of a felony and nonetheless possessing a firearm— a Bryco Arms, model Jennings Nine, 9 millimeter pistol—which previously had been shipped and transported in interstate commerce in violation of 18 U.S.C. § 922(g)(1) and (2). (ECF No. 12.) On August 3, 2020, Defendant was arraigned on the indictment and entered a plea of not guilty. (Minute Entry dated August 3, 2020.) During the initial conference before this Court on September 9, 2020, the Court granted Defendant leave to file the instant motion to suppress.

Defendant filed his motion to suppress and supporting papers on November 30, 2020. (ECF No. 26.) The Government filed its memorandum in opposition on December 21, 2020. (ECF No. 30.) Defendant filed his reply on January 4, 2021. (ECF No. 31.) The Court issued an opinion and order granting Defendant's motion insofar as that motion sought an evidentiary hearing. (ECF No. 33.) The Government moved for reconsideration of the Court's opinion to the extent that the Court indicated that it would allow testimony during the hearing regarding the voluntariness of Defendant's post-arrest statements. (ECF No. 34.) Defendant responded to the Government's

---

[1] The Minute Entry dated June 17, 2020 mistakenly indicates that bail was granted even though Defendant remains in custody. (*See* Minute Entries dated August 3, 2020; September 9, 2020; and March 2, 2021.)

motion for reconsideration, clarifying that he was not challenging the voluntariness of any post-*Miranda* statements. (ECF No. 37.)

## III. Evidentiary Hearing

The Court held an in-person evidentiary hearing on March 2, 2021. (Minute Entry dated March 2, 2021; March 2, 2021 Hrg. Tr. ("Tr.").) The Government called eight witnesses: YPD Sergeant Peter Schwartz; YPD Officers Patrick Greene, Anthony Fico, Vincent Reda, Michael Giusto, Alejandro Vieira, and James Menton; and Daniel McKenna, who, on the date of the arrest, was a Special Agent with the FBI. Defendant did not testify.

The Court summarizes the testimony relevant to when the Defendant was seized and the reasonableness of the stop below.[2]

### A. Sergeant Schwartz

Sergeant Schwartz, who has worked for YPD since 2006, supervises the Third Precinct Anti-Crime Unit, and has held the rank of Sergeant for approximately four and a half years. (Tr. at 4-5.) The Third Precinct Anti-Crime Unit is a plainclothes unit that makes approximately 150 to 200 arrests per year, of which 15 to 20 are typically for violent crimes or firearms offenses. (Tr. at 5.)

Sergeant Schwartz testified that Cerrato Park is a "high crime area" (Tr. at 6, 44), and evidence presented during the evidentiary hearing indicated that there was some criminal activity around Cerrato Park on the date of Defendant's arrest. For example, there were complaints from various sources about people selling drugs, playing cards, littering and drinking around Cerrato

---

[2] Officers Menton and Viera arrived to transport Defendant after Defendant was already under arrest and Special Agent McKenna interviewed Defendant after he was transported. Since these three witnesses testified about issues other than when Defendant was seized and reasonable suspicion, the Court does not summarize their testimony in detail.

Park. (Tr. at 21.) Specifically, the YPD Call Sheet for the date in question (Government Exhibit ("GX") 51) indicates that there were only three calls for officer-initiated response in the area of Cerrato Park (Tr. at 43). While there were other reports concerning conduct in the area of Cerrato Park on the date of the arrest, none of these other callers reported violent behavior or the presence of firearms. (Tr. at 44.)

On the date of Defendant's arrest, Sergeant Schwartz was conducting surveillance in an unmarked car in the area of Cerrato Park on Riverdale Avenue. (Tr. at 6.) At approximately 5:20 P.M., during daylight, Sergeant Schwartz observed Defendant through binoculars from approximately 70 yards away on the opposite side of the Riverdale Avenue as Defendant was walking northbound on Riverdale Avenue toward the Sergeant. (Tr. at 6-8, 21, 35, 36, 37.) Sergeant Schwartz testified that Defendant caught his attention because "[h]e was walking by himself, a taller male, long hair. I noticed a bag attached to his chest, he was walking on Riverdale Avenue. As he continued walking, I observed the bag to swing freely about his person as if there was a heavy object inside." (Tr. at 8-9.)

Sergeant Schwartz testified that Defendant's furtive response to a YPD vehicle further drew his attention. Specifically, Sergeant Schwartz observed that, when Defendant took notice of a marked YPD patrol car, "he immediately grasped towards the bag, pulled it in towards his person with his right side, his right arm into his person, he looked over his shoulder nervously at the police car." (Tr. at 9, 11 ("he adjusted it in relation to the police car. He reacted to the police car and immediately grasped at the bag"), 38 (noting that Defendant looked over his shoulder at the patrol car intermittently for fifteen to twenty seconds).) Sergeant Schwartz testified that the male "kept his line of sight on the car and immediately grasped at the bag on his right side" and that he "continued walking . . . looked over his shoulder one or two times." (Tr. at 9-10.) Sergeant

4

Schwartz admitted that Defendant did not change his direction when he saw the marked car, he kept walking north as the patrol car traveled southbound away from him. (Tr. at 29, 39.) No criminal act had been committed up to that point, and there was no testimony proffered that the Defendant hastened his pace.

Sergeant Schwartz testified that "when [Defendant] secured the [bag] against his person like that, I thought there was possibly a weapon inside." (Tr. at 11.) Sergeant Schwartz testified that he believed there was possibly a weapon in the bag based on his own experiences carrying a weapon on his person: "you check on your weapon where it is, especially if you were looking to have access to that weapon." (Tr. at 11, 49.) Sergeant Schwartz admitted that he does not carry a weapon in a cross-body bag like the one Defendant was wearing. (Tr. at 41-42.)

Sergeant Schwartz admitted that Defendant's right side was furthest away from Sergeant Schwartz as he observed him walking north on Riverdale Avenue. While he stated that as Defendant turned to look toward the patrol car, Defendant's right side was visible to him, he also stated that as Defendant "secured" the bag as the patrol car passed by moving his forearm toward his torso "in an unnatural movement," Defendant covered up the bag, diminishing Sergeant Schwartz's view of the bag. (Tr. at 28, 36, 48, 50-51.) Sergeant Schwartz stated that at the time he suspected that the heavy object might be a weapon, he was forty to fifty feet away from Defendant when he formed the suspicion that the heavy object within the bag might be a weapon. (Tr. at 35, 47.)

When asked what made him believe that the bag contained a weapon, Sergeant Schwartz answered "Just the weight of the object holding the bag down, the way it swung a little bit, and he grasped at it when he saw the police car . . . The bag appeared weighted down . . . also the shape

of it, too."[3] (Tr. at 17.) Later, when asked why he believed the heavy object to be a weapon rather than some other object such as a brick or several cell phones, Sergeant Schwartz stated "[t]he shape of the object, the way it weighted down within the bag and was freely moving within the bag,"[4] and "based on his training and experience of carrying a weapon every day and his involvement in dozens of gun arrests." (Tr. at 41.) He further admitted that the bag is opaque, he could not see a gun sticking out of the bag, and did not see whether the heavy object was a tool, coke bottle, or flashlight. (Tr. at 46-48.)

Later, the Court asked "what is it that you saw that made you believe that it was a weapon?" to which Sergeant Schwartz responded "Just the way it was seated in the bag and the way, the outline of it. The way it was seated." (Tr. at 47.) When the Court followed up by asking Defendant to describe what if any outline he saw, Sergeant Schwartz stated: "It appeared to be like – I would want to say like a seven, you could see it was higher on one end what appeared to be a barrel protruding from it." (Tr. at 47.) Sergeant Schwartz admitted that he did not witness Defendant try to grasp a handle through the bag at any point. (Tr. at 49.)

Sergeant Schwartz demonstrated during the hearing how Defendant was wearing the cross-body bag (GX 1), which, during the demonstration, contained the firearm recovered from the bag at the time of Defendant's arrest (GX 2) and the bullets (GX 3), which were in the gun at the time of Defendant's arrest, and how Defendant responded when the marked police car drove by. (Tr. at 15-17.) Sergeant Schwartz confirmed that Defendant's right arm remained at his right side grasping the bag as he turned his head to follow the marked car. (Tr. at 16.)

---

[3] Sergeant Schwartz did not articulate what if anything was distinctive about the "shape" to suggest the weighted object could be a weapon.

[4] Again, Sergeant Schwartz did not articulate what if anything was distinctive about the "shape" to suggest the weighted object could be a weapon.

Sergeant Schwartz admitted that Defendant did not match the description of anyone suspected of, or reported for, engaging in a crime and Sergeant Schwartz did not witness Defendant interacting with anyone or engaging in any illegal activity. (Tr. at 29-30.)

After Sergeant Schwartz observed Defendant, he called Officers Greene and Fico and told them that he had "observed a male walking north on Riverdale Avenue, that he had a bag slung across his chest, it was swinging freely, appeared to have a heavy object in it. The police car drove past him. As it drove past him, he immediately grasped at the bag, pulled the bag tight to his person" and that Sergeant Schwartz believed that Defendant could have a weapon. (Tr. at 12.) After the call, Sergeant Schwartz maintained his position, so he was not present when Defendant was arrested. (Tr. at 12.)

### B. Officer Greene

Officer Greene is a member of the YPD Third Precinct's Anti-Crime Unit and has been with the YPD for approximately five years. (Tr. at 53.) On the date of Defendant's arrest, he was in the area of Cerrato Park with his partner, Officer Fico, in an unmarked car that Officer Fico was driving and both officers were in plainclothes. (Tr. at 53-54.)

Officer Greene first became aware of Defendant when Sergeant Schwartz called Officers Green and Fico on a cell phone.[5] (Tr. at 54-55.) Sergeant Schwartz told Officers Greene and Fico that:

> there was a suspicious male walking northbound on Riverdale Avenue near Cerrato Park, that the male was carrying an orange fanny pack slung over his left shoulder hanging on the right side of his torso, that the bag was – there appeared to be heavily weighted object inside the bag. The bag was swinging freely about his person

---

[5] Officer Greene stated that officers in the Third Precinct communicate via cell phone as opposed to patrol radio "from time to time" "especially when there's a lot of radio chatter going on through the city because all four precincts and units are on the same radio frequency." (Tr. at 54-55.)

and that he was consistently adjusting the bag on his torso. Also that a marked patrol car had driven by going southbound on Riverdale Avenue and that this male had taken notice of the patrol car, appeared to slow his steps down in an attempt to possibly avoid to patrol car while it was still in the area . . . . and that he believed there might be a weapon inside the pouch, the fanny pack.

(Tr. at 55-56.) Sergeant Schwartz did not tell Officers Fico and Greene that he saw Defendant with a gun or that Defendant matched the description of someone who had just committed a crime. (Tr. at 72.) Sergeant Schwartz also did not specify what type of weapon he thought Defendant might have. (Tr. at 100.)

Officer Greene first observed Defendant crossing Prospect Street and Riverdale Avenue (Tr. At 56) and, from his vantage point in the unmarked vehicle approximately seventy to seventy-five feet away from Defendant, had a clear view of Defendant and the bag. (Tr. at 65-67.) "We observed him to have a fanny pack slung over his shoulder. There appeared to be a heavily weighted object inside the fanny pack. As he walked, the bag swung freely about the side of his person. As he walked, he would adjust the bag around his torso. As passing pedestrians and cars drove and walked by, he would look over his shoulders at passing pedestrians and vehicles." (Tr. at 56-57.) Officer Green testified that these movements suggested that Defendant might have a weapon. (Tr. at 57.)

Officers Green and Fico observed Defendant walk northbound on Riverdale Avenue toward Hudson Street and cut through a parking lot rather than continue walking on the sidewalk. (Tr. at 74). Officers Greene and Fico turned onto Riverdale Avenue—which runs parallel to the parking lot in which Defendant was walking—and maintained sight of Defendant even though there were cars parked between the officers and Defendant as Defendant walked through the parking lot. (Tr. at 76; Def. Exs. A-5, A-7 (photographs depicting the view from Prospect of the northeast corner of Prospect and Riverdale showing Riverdale, the sidewalk, and the parking lot

8

and the parking lot, respectively).) Photographs entered into evidence by Defendant show that in addition to the row of parked cars and the sidewalk, the traffic lane of Riverdale Avenue was separated by a fence that appears to be brick for some length and wrought iron slats for other portions. (Def. Exs. A-5, A-7, A-10.)

Officers Greene and Fico notified Officers Reda and Giusto, of the Fourth Precinct, via cellphone, that they were going to attempt to stop a suspicious male in the area of Riverdale and Hudson Street, in the Fourth Precinct. (Tr. at 57.) Officers Reda and Giusto said that they would respond to the location, which they did within thirty seconds to a minute. (Tr. at 57-58.) While Officers Greene and Fico were waiting in their unmarked vehicle for Officers Reda and Giusto to respond, they continued watching Defendant who was "adjusting the bag, looking into the bag, looking over his shoulders at the passing pedestrians and vehicles, and he proceeded to turn eastbound onto Hudson Street." (Tr. at 58.) Officer Greene further testified that Defendant had his cell phone in his hands as he was walking. (Tr. at 86.) Officer Greene did not recall whether Defendant was wearing headphones prior to or during the stop. (Tr. at 89.)

Officer Greene testified that based on the information related by Sergeant Schwartz and Officer Greene and Fico's own observations of Defendant "adjusting the bag with the heavy object inside of it as the bag swung freely by his person, looking over his shoulder at the passing pedestrians and vehicles that drove by" Officers Greene and Fico decided to "approach and conduct an interview."[6] (Tr. at 63.) Officer Greene testified that he had decided to stop Defendant by the time Defendant reached Hudson Street. (Tr. at 79.)

---

[6] While Officer Greene initially stated that he intended to "interview" Defendant, he later confirmed that he was not engaging in a common law inquiry (Tr. at 98) and that he did not ask Defendant any questions because there was no time after Officer Greene identified himself as a police officer (Tr. at 99).

When Officers Reda and Giusto pulled up behind Officers Greene and Fico in their unmarked vehicle, Officer Greene exited his vehicle and began to approach Defendant. (Tr. at 58-59.) Officer Fico continued eastbound in the vehicle and exited east of Defendant's location to approach him from a different angle. (Tr. at 58.) Officer Greene testified that as he approached Defendant from behind, he had a shield around his neck, a vest on, police radio, gun, handcuffs, extra magazine, and verbally identified himself as a Yonkers Police officer and commanded Defendant to show his hands. (Tr. at 59, 61, 79, 81.) Officer Greene further testified that Officers Reda and Giusto exited their vehicle at the same time and also approached Defendant from behind. (Tr. at 79.) Officer Greene testified that the four officers approached Defendant as they did to "prevent any possible escape route if he decided to run from us." (Tr. at 80.) At bottom, the officers intended to block the Defendant's path.

Officer Greene testified: "once [Defendant] appeared to take notice of me, his eyes began to widen, he took a step back away from me and my partner, Officer Fico. He bladed his body and attempted to conceal the bag away from me by turning his body in a manner that he was no longer facing, the pouch of the bag was no longer facing me." (Tr. at 59, 63, 82.) Officer Greene testified that at this point, Defendant was about five or six feet away from Officer Greene and Officer Fico was a few feet behind Officer Greene. (Tr. at 61, 101.) These movements suggested to Officer Greene that Defendant might have and be reaching for a weapon because he was concealing the bag away from Officer Greene who could no longer see Defendant's hands. (Tr. at 60.)

During the hearing, Officer Green put on the bag and demonstrated how Defendant was wearing the bag, how he was grasping at the bag at he looked at passing vehicles and pedestrians, and how he bladed his body when Officer Greene approached him. (Tr. at 60, 64, 67.) As Officer Greene modeled the latter, the Prosecutor stated: "The record should reflect that Officer Greene

took a step forward, grabbed the fanny pack, and turned his body away from the location where Officer Greene described he was standing." (Tr. at 67.) Officer Greene further admitted that merely having someone's eyes widen when approached by a police officer is not indicative of criminal activity but that clutching a bag is a "leading factor" and that grabbing one's pocket could also be indicative of criminal activity. (Tr. at 103.)

Officer Greene testified "after [Defendant] bladed his body away from me, attempted to conceal the bag, I went to go reach for the bag to conduct a pat-down of the bag, and as I was doing that, I observed the outline of what appeared to be a firearm inside of the bag" and then, once he touched the bag, he felt an object that "had the shape and weight consistent with that of a firearm." (Tr. at 62.) Officer Green confirmed that he did not see the outline of any weapon prior to reaching for the bag and that "from farther away [he] was not positive that it was the outline of a gun, it just appeared to be a heavy object inside of the bag." (Tr. at 94, 96.) Officer Greene admitted that prior to seeing the outline as he reached for the bag, the heavy object could have been a heavy tool or large cellphone but that Officer Greene did not believe that was the case based off of Defendant's "nervous behavior" adjusting the bag. (Tr. at 95-96.) He further testified that he was going to grab the bag regardless of whether he saw the outline of the gun. (Tr. at 97.) Officer Greene confirmed that the incident report does not mention whether he saw an outline of a gun as he reached for the bag. (Tr. at 91-92; *see* Def. Ex. B-1.)

As Officer Greene grabbed the bag, Officer Fico grabbed one of Defendant's arms to prevent Defendant from reaching for a weapon. (Tr. at 62.) After feeling what he believed to be a weapon, Officer Greene placed Defendant in handcuffs, removed the bag from Defendant's person by unclipping the strap, and handed the bag to Officer Fico. (Tr. at 63.) At some point, Defendant was turned against the wall of the building. (Tr. at 82.) Officer Greene placed Defendant in

handcuffs before the officers confirmed what was inside the bag "due to the belief that there was a firearm in the bag. For my safety, for his safety." (Tr. at 64.) Officer Fico then opened the bag and found the firearm inside. (Tr. at 68.) Officer Greene testified that until Officer Fico opened the bag, Officer Greene did not see a gun. (Tr. at 82.) Officer Fico told Officer Greene that there was a firearm and then put over the radio that they had a suspicious male stop from which they recovered a firearm and requested transport. (Tr. at 68.)

Officer Greene confirmed that in addition to the gun, the bag Defendant was wearing at the time of his arrest also contained a scarf and possibly loose cigarettes. (Tr. at 84, 87.)

### C.    Officer Fico

Officer Fico is a member of the Pattern Crimes Task Force, has worked for YPD for five and a half years, and has served as a Marine Corps sergeant for four years. (Tr. at 104.) On the date of Defendant's arrest, Office Fico was working in the Third Precinct Anti-Crime Unit with Officer Greene in the area of Riverdale Avenue and Prospect Street, which is considered a high-crime area. (Tr. at 105.) Officer Fico received a phone call from his supervisor, Sergeant Schwartz, which he took on speakerphone, and Sergeant Schwartz related that he observed a male with an orange fanny pack with a weighted item in it that cased the pack to swing and drop down the side of his torso and that the male would occasionally grasp the bag, bring it back to the center of his chest, and then glance around to see if he was observed. (Tr. at 106.) Sergeant Schwartz further related that when a marked patrol car drove by the individual he "looked at the marked radio car, became protective of the fanny pack and watched the radio car and slowed his pace as if he were going to alter his direction of travel should the radio car notice him" and that Sergeant Schwartz thought there might be a firearm in the bag. (Tr. at 107, 131.)

Officer Fico drove to the intersection of Riverdale Avenue and Prospect Street where he saw Defendant crossing through the intersection traveling northbound on Riverdale Avenue. (Tr. at 107-08.) Officer Fico observed Defendant "touching the fanny pack and bringing it up to the center of his chest . . . . the fanny pack would come down to the side of his torso and then he'd bring it back up, [Defendant] would bring it back up, and he would look around every time that this happened" which suggested to Officer Fico that there could be a firearm in the bag. (Tr. at 108-09.)

Officer Fico confirmed that there were cars between the officers and the Defendant as Defendant walked through the parking lot. (Tr. at 114.) Officer Fico continued to drive his unmarked car on Riverdale Avenue keeping behind Defendant until Defendant arrived at and turned right onto Hudson Street.[7] (Tr at 109.) Officer Fico notified Officers Reda and Giusto of the Fourth Precinct that he and Officer Greene had crossed into the Fourth Precinct. (Tr. at 109.)

On Hudson Street, Officer Greene exited the vehicle, and Officer Fico drove past Defendant. (Tr. at 109.)  Officer Fico testified that "as [he] drove past, [he] saw Officer Greene walk toward the male, the male stopped and turned towards Officer Greene" at which point Officer Fico was exiting the vehicle and was a few feet behind Officer Greene. (Tr. at 109-110, 119.) Officer Fico also testified that while Officer Greene approached Defendant from the west side traveling east (in the same direction as Defendant), Officer Fico approached from "the other end." (Tr. at 121.)

As Officer Fico approached Defendant, his police shield was visible, and Defendant "grasped the fanny pack at his torso, he bladed his body away and looked over his shoulders for

---

[7] At one point, Officer Fico testified that he did not recall whether, as Defendant walked through the parking lot, Officer Fico drove through the parking lot or along Riverdale Avenue. (Tr. at 115.)

what I assumed to be the potential route to walk away from us." (Tr. at 110, 121 ("he grasped the bag, bladed his body away, took a step back, and then looked over his shoulders").) These movements suggested to Officer Fico that there could be a weapon in the bag because when the officers identified themselves as police, the Defendant "appeared very nervous and did not want us anywhere near him." (Tr. at 110.) Officer Fico confirmed that he did not see Defendant unzip the bag, that Defendant did not threaten the officers or try to run, and that he never saw the outline of a gun through the fanny pack. (Tr. at 122.)

When Officer Fico saw Defendant take a step back, Officer Fico grabbed Defendant's right arm. (Tr. at 111, 123.) Officer Fico testified that at this point he was "confident there was a firearm in that fanny pack" because, in addition to the observations Sergeant Schwartz relayed, Officer Fico personally observed that "the bag was very heavy, he kept grabbing it and bringing it to his torso. He appeared very nervous, looking over his shoulders as if someone was observing him every time he touched that fanny pack. And then, when I approached him, I observed that grab and turn and looking for possible routes to flee." (Tr. at 132.) Officer Fico conceded that it could have been that Defendant was nervous with respect to the bag because it contained something valuable and he was worried about getting robbed or that it could be fragile and get broken. (Tr at. 141.)

Officer Greene grabbed Defendant's left arm and patted the "now swinging fanny pack, which was on [Defendant's] torso at this point." (Tr. at 111.) Officer Greene related to Officer Fico that he felt a gun. (Tr. at 111, 123.) Officer Greene put Defendant in handcuffs and unclipped the fanny pack and handed it to Officer Fico. (Tr. at 111, 123-24.) Officer Fico testified that from the time the officers approached Defendant to the time that he was in handcuffs was about five to ten seconds. (Tr. at 126.)

Officer Fico opened the bag and saw what appeared to be a firearm, which he removed from the bag and confirmed that it was loaded and then put the gun back into the bag. (Tr. at 111.) Officer Fico testified that he did not recall whether anything else was in the bag. (Tr. at 125.) At that point, Officer Fico notified headquarters of their location and awaited transport. (Tr. at 112.) Officer Fico testified that while the officers turned Defendant toward the wall (Tr. at 123), no one ever pushed Defendant face-first against a wall (Tr. at 113).

Officer Fico confirmed that while they were observing Defendant he did not see Defendant carrying a gun, assault anyone, rob anyone, run, try to enter any buildings, interact with anyone or change his direction. (Tr. at 115-16.) Officer Fico did not recall whether Defendant was listening to headphones as he walked (Tr. at 116), but admitted that told the prosecutor during a meeting on May 30, 2020 that Defendant had headphones in his ears. (Tr. at 116-17; GX 3501-02 (prosecutor notes from May 30, 2020 meeting).) Officer Fico further acknowledged that the fanny pack is not see through and that the heavy object could have been a water bottle, a heavy camera, bottle of whiskey, any number of objects other than a gun. (Tr. at 117-18.)

Officer Fico prepared the incident report after the arrest and both Officer Greene and Sergeant Schwartz subsequently reviewed the report. (Tr. at 127.) Officer Fico confirmed that the incident report does not mention that the arrest took place in a high-crime area (Tr. at 127), but testified that the area is a high-crime area and that Sergeant Schwartz—for whom he wrote the report—also knew the area around Cerrato Park to be a high-crime area. (Tr. at 134.)

### D.    Officer Reda

Officer Reda is member of the Pattern Crimes Task Force and was working in the Fourth Precinct's Anti-Crime Unit in plainclothes in an unmarked car with Officer Giusto on the date of Defendant's arrest. (Tr. at 152-53.) Officer Fico called Officer Reda and advised him that Officers

Fico and Greene were about to stop a suspicious male who was crossing into the Fourth Precinct. (Tr. at 153-54.) Officers Reda and Giusto responded to 2 Hudson Street and pulled up behind the Third Precinct car as the two Third Precinct Anti-Crime officers exited their car and Officer Reda saw the male Officer Fico described, who he identified as the Defendant. (Tr. at 156.) Then Officer Reda stopped his vehicle and exited his car. (Tr. at 156.) As Officer Greene approached Defendant, Defendant "stopped in his tracks, took a step backwards, bladed the right side of his body away from Officer Greene, began looking around for a potential escape route . . . . The fact that he bladed the right side of his body away, which is sometimes even a subconscious effort that people do when they're carrying something illegal such as a weapon. They don't want it to be seen. They try to get it as far away from the officer that's approaching them as possible." (Tr. at 157.) Officer Reda testified that he has seen people he has approached on the scene make such a blading movement about twenty times. (Tr. at 158.)

From about ten feet away, Officer Reda then saw Officer Greene pat down the fanny pack and then immediately place Defendant in handcuffs. (Tr. at 158, 164.) Officer Reda did not recall what Officer Fico was doing as Officer Greene handcuffed Defendant but after Defendant was cuffed, Officer Greene removed the bag from Defendant and handed it to Officer Fico who opened the bag and advised the officers that there was a firearm inside. (Tr. at 158-59.) Officers Reda and Giusto then stood by the firearm while they awaited the Crime Scene Unit. (Tr. at 159.)

Officer Reda confirmed that prior to Officer Fico opening the bag, Officer Reda did not see a gun on Defendant. (Tr. at 163.)

### E.    Officer Giusto

Officer Giusto is assigned to the Fourth Precinct's Anti-Crime Unit, has worked for the YPD for nearly five years, and previously worked for three years as a police officer for the City of Mount Vernon and Village of Pelham Manor. (Tr. at 165.)

On the date of Defendant's arrest, Officer Fico called Officer Reda for assistance. (Tr. at 166.) When Officers Giusto and Reda arrived at Hudson Street and Riverdale Avenue, Officer Giusto saw Officers Greene and Fico exit their vehicle in front of Officers Giusto and Reda's vehicle, and approach Defendant. (Tr. at 166-67.) When the Third Precinct officers approached Defendant, Defendant "stopped and simultaneously took a step backward and bladed his right side of his body away from the Third Precinct officers, which "effectively made the right side of his body face myself and my partner." (Tr. at 167.) From about ten feet away, Officer Giusto saw that Defendant was "holding an orange fanny pack, Nike fanny pack," but did not see a gun or see Defendant try to open or grab something inside of the bag. (Tr at 167-68, 172). Officer Greene grabbed the bag and then placed Defendant into handcuffs. (Tr. at 167-68.) Defendant's movements suggested to Officer Giusto that Defendant might flee from the scene. (Tr. at 167.)

Officer Fico opened the bag and Officer Giusto saw a handgun inside. (Tr. at 168.) Officer Giusto helped to secure the firearm. (Tr. at 169.)

***

At the conclusion of the hearing, the Court directed the parties to limit their post-hearing briefing to whether the YPD officers who effectuated Defendant's arrest had reasonable suspicion to stop and search him. (Tr. at 236.)

**STANDARD**

To defeat a suppression motion, "[t]he Government bears the burden of proof." *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir. 2008). The Government must make this showing "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

**DISCUSSION**

"Under the long-established rule of *Terry v. Ohio*, police may only stop someone when they have 'reasonable suspicion supported by articulable facts that criminal activity may be afoot.'"[8] *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) and citing *Terry*, 392 U.S. 1 (1968)). "Reasonable suspicion must be 'based on specific and articulable facts' and not on 'inchoate suspicion or mere hunch.'" *Id.* (quoting *United States v. Bayless*, 201 F.3d 116, 132-33 (2d Cir. 2000)). To determine whether officers have reasonable suspicion, courts "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks and citation omitted). While courts evaluate this totality of the circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," they may "not merely

---

[8] "In *J.L.*, the Court expressly rejected a firearms exception to *Terry*'s demand that a stop be supported by reasonable suspicion, specific and particularized. The Court acknowledged the danger posed by firearms and reaffirmed that this danger is already accounted for by the very rule of *Terry*—allowing the police to stop and frisk based upon reasonable suspicion, instead of demanding 'that officers meet the higher standard of probable cause.'" *United States v. Freeman*, 735 F.3d 92, 95 (2d Cir. 2013) (quoting *J.L.*, 529 U.S. at 272-73)).

defer to the police officer's judgment." *Bayless,* 201 F.3d at 133 (internal quotation marks omitted). Moreover, a stop must be "justified at its inception." *Terry,* 392 U.S. at 20.

"Where officers have reasonable suspicion that the suspect has committed, or is about to commit, a violent or dangerous crime, the suspicion necessary to justify a stop ordinarily justifies a frisk as well." *United States v. Jackson,* No. 15-CR-106 JPO, 2015 WL 4557401, at *7 (S.D.N.Y. July 29, 2015) (citing Wayne R. Lafave, 4 Search & Seizure § 9.6(a) nn.55-61 (5th ed. 2014) (collecting cases)).

## I.       When Defendant Was Seized

As an initial matter, in order to assess whether there was reasonable suspicion for the stop "at its inception," *Terry*, 392 U.S. at 20, the Court must determine when the YPD seized Defendant.

> [A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, (1980); *also Freeman*, 735 F.3d at 96 ("A seizure triggering the protection of the Fourth Amendment occurs once an officer has 'by means of physical force or show of authority, . . .in some way restrained the liberty of a citizen.'" (quoting *Terry*, 392 U.S. at 20)). "[A] search, like a seizure, may begin before there is any physical contact, at the time when a reasonable person would have believed that the search was being initiated." *United States v. Weaver,* 975 F.3d 94, 101 (2d Cir. 2020) (internal quotation marks omitted).

The parties dispute when Defendant was seized. Defendant avers that he was seized when Officer Greene identified himself and demanded that Defendant show his hands since, at that point, he was surrounded by four plainclothes officers and no reasonable person would have believed he

was free to leave. (Def.'s Post-Hearing Br. at 9-10 (ECF No. 38).) The Government contends that the seizure did not occur until Defendant was physically restrained—after Officer Green saw the outline of what he believed to be a gun as he reached for the bag and then felt a weapon in the bag—because, after Officer Greene directed Defendant to stop and show his hands, Defendant took a step back and bladed the right side of his body away from Officer Greene, purportedly refusing to submit to law enforcement authority.[9] (Gov't Post-Hearing Br. at 14-15 (ECF No. 39).)

> As in *Freeman*, the Government likely seeks to postpone the moment of seizure
>
> in order to reap the benefits of the decisions in *California v. Hodari D.,* 499 U.S. 621 (1991), *United States v. Muhammad,* 463 F.3d 115 (2d Cir. 2006), and *United States v. Swindle,* 407 F.3d 562 (2d Cir. 2005). In each of these cases, the police ordered an individual to stop but the person did not comply and attempted to flee. Further, in each case, the reviewing court concluded that because the seizure was not effectuated at the mere command to stop, the ensuing flight provided the police with reasonable suspicion for the seizure once they had caught up with the fleeing individual. . . . the cases *Hodari D.*, *Muhammad*, and *Swindle,* have no applicability where the initial seizure is neither broken away from or where the individual does not flee before he is seized.

735 F.3d 92, 96-97 (2d Cir. 2013). As the Second Circuit emphasized in *Simmons*,

> [t]he rule from *Hodari D.*—"the grounds for a stop may . . . be based on events that occur after the order to stop is given,"—has been applied only in cases where the suspect attempts to flee from police after being ordered to stop. *Hodari D., Swindle*, and *Muhammad* all involved a police show of authority, a defendant who refused to comply by fleeing, police pursuit, and a 'seizure' occurring at the moment the defendant was physically restrained.

560 F.3d at 106 (quoting *Swindle,* 407 F.3d at 568, and citing *Hodari D.*, 499 U.S. at 625-26; *Muhammad,* 463 F.3d at 122-23; *Swindle,* 407 F.3d at 572-73).

---

[9] Since Defendant did not testify at the hearing, his affidavit and any potential inconsistencies between it and other statements Defendant made that would undermine Defendant's credibility are irrelevant to the Court's determination here, which is exclusively focused on whether, at the time they seized Defendant the YPD officers had reasonable suspicion that Defendant had a weapon. For example, the video of a post-arrest statement in which Defendant stated that he had consented to a police search (GX 60) is irrelevant where the officers' testimony clearly establishes that this was not a consensual encounter.

The evidence before the Court does not establish by a preponderance of the evidence that Dixon attempted to flee or otherwise refused to submit to Officer Greene's show of authority. Rather, the Court finds that the evidence is inconclusive as to whether Defendant made any suspicious movement after Officer Green ordered him to stop and that, in any event, fewer than ten and likely only a mere few seconds elapsed between the time Officer Green gave the verbal order to stop and the time that Officer Green grabbed the bag and Officer Fico grabbed Defendant's right arm.

It is undisputed that, prior to Officer Green's order, Defendant was walking east along Hudson Street, or from the right to left side of the photograph referred to as Defense Exhibit A-13 and Officers Green, Reda, and Giusto came up behind Defendant (approaching him from the west). It is also undisputed that, upon hearing Officer Green's order, Defendant ceased traveling east ahead of these officers. The evidence is inconsistent, however, as to where Officer Fico approached Defendant from and whether Defendant attempted to flee or conceal the bag.

As to Officer Fico's approach, Officer Greene testified both that Officer Fico was "close behind" Officer Greene as he approached Dixon (Tr. at 79, 81-82, 101) and that while the officers did not "surround" Defendant, they approached him in a way that would "prevent any possible escape route if he decided to run from us." (Tr. at 80.) The latter suggests to the Court that the officers were not all approaching from the same place.[10] Officer Fico testified that he watched Officer Greene approaching Defendant from behind as Officer Fico drove the car past Defendant and then approached Defendant "from the other end" (Tr. at 109-10, 121) and that he approached Defendant a few feet behind Officer Greene (Tr. at 119-20). The Government's brief states that

---

[10] Officer Reda testified that he did not recall what Officer Fico was doing as Officer Greene grabbed the bag. (Tr. at 158.)

"Officer Fico parked the car just east of the defendant's location on Hudson Street." (Gov't Post-Hrg. Mem. at 5.) Officers Reda and Giusto testified that they watched both Third Precinct officers exit their vehicle before they exited, suggesting that Officers Greene and Fico exited at the same time. While Officer Greene did not recall which of Defendant's arms he grabbed, Officer Fico testified that he grabbed Defendant's right arm, which only makes sense if Officer Fico was in fact approaching from the east. The discrepancies over Officer Fico's approach undermine the credibility of the testimony regarding the logistics of the stop.

The inconsistencies regarding Officer Fico's location, coupled with the testimony from the other officers at the scene also calls into question whether Defendant attempted to flee. While all four officers testified that Defendant took a step back and bladed his body away from Officer Greene, that is not consistent with how Officer Greene demonstrated Defendant's behavior to the Court during the hearing, which the Prosecutor described as follows: "The record should reflect that Officer Greene took a step forward, grabbed the fanny pack, and turned his body away from the location where Officer Greene described he was standing." The evidence before the Court does not elucidate what Defendant's "step back" means where, as here, Defendant was walking in front Officer Greene, who approached him from behind and none of the officers' testimony specifies whether the direction of the "step back" was a continuation in the direction Defendant had been walking prior to the order to stop—which could have been a step toward Officer Greene—or whether, having stopped and turned to face Officer Greene, Defendant took a step back from Officer Greene—which might have been a step towards Officer Fico if Officer Fico approached

Defendant from the east—or, merely a step in any other direction as an act of surprise or an attempt to flee.[11]

As to the alleged "blading" away from Officer Greene, the Court is not convinced that this was an attempt to flee or conceal. The Court is also perplexed by where the officers were located relative to the Defendant where Officer Greene testified that Defendant bladed his right side away from Officer Greene but Officer Giusto who was behind Officer Greene testified that Defendant "stopped and simultaneously took a step backward and bladed his right side of his body away from the 3d Precinct, Anti-Crime officers which effectively made the rights side of his body face myself and my partner." (Tr. at 167.) Regardless of the direction in which Defendant pivoted, or the precise location of the officers, the evidence clearly establishes that Defendant had been walking eastbound when he was approached from behind and turned toward Officer Greene when Officer Greene addressed him. In order to turn his head one hundred and eighty degrees so that he faced Officer Greene, his body would necessarily have pivoted. It is completely normal for someone, when called to by another walking behind him, to pivot his body so that he can see the person behind him.

Accordingly, the Court finds that, as in both *Freeman* and *Simmons*, Dixon initially complied with Officer Greene's order and never "broke away" even if he did not raise his hands immediately.[12] *Freeman*, 735 F.3d at 96-97 (holding that seizure occurred when officer grabbed

---

[11] The Government's brief states that Defendant "took a step back and away from *Greene and Fico*." (Gov't Post-Hrg. Mem. at 5.) If Defendant stepped back from Officer Fico who was, as testified to, approaching from the east and Officer Greene who was definitely approaching from the west, it is likely that Defendant's step back placed him closer to the wall of the building against which Defendant was subsequently turned.

[12] The Government's contention that Defendant's "temporary halt" does not amount to submission to authority and therefore that the Court should consider Defendant's behavior after Officer Greene ordered him to stop is unavailing. (Gov't Post-Hrg. Mem. at 11 (quoting *United States v. Baldwin*, 496 F.3d 215, 2018-19 (2d Cir. 2007)). *Baldwin*, like *Hodari D.*, *Muhammad*,

defendant around the waist in a "bear hug" because even though there was a subsequent struggle before defendant was restrained on the ground, from the first physical contact, defendant never broke away and therefore the resistance during the struggle could not be considered in the court's determination as to the reasonableness of the stop); *Simmons*, 560 F.3d at 106-07 (holding that defendant was seized when he obeyed order to stop, even if he subsequently refused to remove his hands and therefore the court could not consider the refusal to remove his hands in the reasonableness of the initial stop). The Court is further persuaded that the evidence strongly suggests that the Defendant was likely startled by Officer Green's order given that Officer Greene testified that Defendant had a cell phone in his hands as he was walking and that Officer Fico recalled telling the Government that Defendant had headphones in his ears at the time of the stop.

The Court's determination that the seizure occurred at the point that Dixon stopped walking ahead of Officer Greene in response to the verbal order is bolstered by Officer Greene's testimony that he was going to search Defendant's bag whether or not Officer Greene had seen the outline of a gun when as he reached for the bag and the Government's statement that "Officer's Greene and Fico called . . . Officers Reda and Giusto[] *for assistance with stopping the defendant*," (Gov't Post-Hrg. Mem. at 4 (emphasis added)), both of which make clear that the officers had decided to stop and search Defendant before they got to Hudson Street.[13] *See Weaver*, 975 F.3d at 102

---

and *Swindle* involved a defendant who fled after "halt[ing] temporarily" and, as the Second Circuit clarified in *Freeman*, such cases "have no applicability where[, as here,] the initial seizure is neither broken away from or where the individual does not flee before he is seized." 735 F.3d at 97.

[13] The Government is correct that "[a]s long as a person to whom questions are put [by law enforcement] remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized objective justification." (Gov't Post-Hrg. Mem. at 13 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). However, the evidence before the Court plainly indicates that at no time after the officers approached Dixon would any reasonable person in Dixon's position have believed that he was free to walk away.

(explaining that courts may consider an officer's subjective intention to determine when a stop was initiated even if such subjective intent cannot be considered to determine whether the stop, once it occurred, was reasonable).

## II.    Reasonable Suspicion

The Government contends that the YPD had reasonable suspicion because officers observed (1) Defendant walking with a cross-body bag containing a heavy object that he repeatedly adjusted and, as he adjusted it, looked around "nervously," (2) that as a marked police car drove past Defendant, he followed the police car with his gaze while securing the bag against his person, and (3) that as Defendant crossed Prospect Street and walked through the parking lot to Hudson Street, he looked "nervously" at passing pedestrians and cars and held the bag close to his side. Defendant avers that he was merely walking down the street and that the officers' observations do not amount to reasonable suspicion that he was engaged in illegal activity. While this is admittedly an incredibly close call, having heard the officers' testimony and observed their demeanor and observed their in-court demonstrations of how Defendant was carrying and behaving relative to the bag, the Court concludes that the Government has not met its burden to prove by a preponderance of the evidence that the officers had reasonable suspicion to stop and search Defendant.

Courts "'look at the totality of the circumstances' in order to determine 'whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.'"

---

Additionally, only five to ten seconds elapsed from Officer Greene's order to Officer Green and Fico's physical restraint of Defendant and the fact that Officers Fico, Reda, and Giusto testified that they thought Defendant *might* try to flee does not change the fact that he was prevented from doing so and, since Defendant never broke away, the "justification for the stop must have preceded [Officer Greene's] grabbing of [Defendant]." *Freeman*, 735 F.3d at 96 (holding that seizure occurred when officer initially grabbed defendant who failed to stop in response to two verbal orders to do so and after which a struggle ensued before defendant was handcuffed).

*Freeman*, 735 F.3d 92, 101 (2d Cir. 2013) (quoting *Arvizu*, 534 U.S. at 273). The officer conducting the stop "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *Padilla,* 548 F.3d at 187 (quoting *Terry,* 392 U.S. at 21). While the officer may not rely on an "inchoate and unparticularized suspicion or hunch, . . . he is entitled to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available to him that might well elude an untrained person." *Id.* Additionally, under the collective knowledge doctrine, "even if the law enforcement officer actually conducting the search [or stop] lacks the relevant facts to support probable cause, the search may nonetheless be permissible if the officer acted on the assessment or instructions of other officers who did have such facts." *United States v. Babilonia*, 854 F.3d 163, 178 (2d Cir. 2017) (citing *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001)).

The strongest factor supporting the Government is that Defendant took notice of and repeatedly looked at the passing patrol car while grasping at the bag. *See, e.g. United States v Sanders*, 208 F.3d 204 (2d Cir. 2000) (summary order) (affirming denial of motion to suppress where officer parked at gas station heard defendant passenger tell vehicle driver to turn to avoid visible checkpoint ahead, car rolled through gas station without stopping, and defendant's gaze remained fixed on checkpoint while he adjusted object at his waistband.) That said, other courts have concluded that merely watching the police does not always amount to reasonable suspicion. *See, e.g., United States v. Parker*, 99-cr-123 (JG), 1999 WL 997282 (E.D.N.Y. Oct. 18, 1999) (granting suppression motion where suspect initially turned away from plainclothes officer in unmarked police car, looked back approximately three times as the unmarked car followed his cab, and exited the cab "awkwardly" when he "bladed" his body and simultaneously placed his hand

on his hip because while such evasion or blading might support stop if person already under suspicion, "In the absence of other circumstances that render the defendant suspect to some degree, mere 'blading' is insufficient to support a stop. It is not sufficiently indicative of criminal activity, and it is readily consistent with innocent explanations").

Sergeant Schwartz testified that after noticing the marked police vehicle, Defendant repeatedly glanced over his shoulder to gaze at it while securing the bag to his person but Defendant continued along his original path (northbound on Riverdale Avenue). Even if he looked at the patrol car and secured the bag while doing so, the Court finds it significant that Defendant continued in his original direction without hastening his pace in response to seeing the marked car. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (distinguishing defendant's "unprovoked flight upon noticing the police" from "going about one's business"); *United States v. Forero-Rincon*, 626 F.2d 218, 223 (2d Cir. 1980) (noting that acceleration of pace after seeing officer supports reasonable inference that suspect "had something to hide"); *United States v. Galan*, No. 14-CR-450 RRM, 2015 WL 1602151, at *5 (E.D.N.Y. Apr. 9, 2015) (finding officers had reasonable suspicion where suspect made eye contact with officer, "repeatedly look[ed] back toward the police vehicle as he continued walking" and then dropped the cup he was holding, which officers believed might contain alcohol); *cf Dancy v. McGinley*, 843 F.3d 93, 110 (2d Cir. 2016) ("Any innocent pedestrian, upon realizing that he is being slowly followed by a police vehicle for some minutes, would look over his shoulder at the officer following him. Calling that behavior suspicious is not consistent with 'commonsense judgments and inferences about human behavior.'" (quoting *Wardlow*, 528 U.S. at 125)).

The Court turns next to Defendant's repeated adjustment of the bag and "nervously" looking around as he did so, including at passing cars and pedestrians. The Court finds that, even

coupled with Defendant's previously discussed response to the passing patrol car, the Government has failed to establish by a preponderance of the evidence the necessary objective facts. In making this determination, the Court finds the following five factors particularly significant.

First, Sergeant Schwartz, Officer Greene, and Officer Fico emphasized that their suspicion that the bag contained a weapon was based on the fact that it clearly contained a "heavy object" and that Defendant was behaving "nervously" with respect to it. However, nervous behavior alone is insufficient where, in an admittedly high-crime area,[14] an individual with a heavy valuable item that was not a weapon might behave in a similarly nervous fashion if he feared being robbed. *See Weaver*, 975 F.3d at 105 n.4 (noting that officer's testimony that the defendant was "concealing something" is not the same as testifying that the object concealed is necessarily dangerous). The nervousness perceived by Officers Fico and Greene as Defendant crossed Prospect Street might, as the Court suggested during the hearing, have an innocent explanation such as general nervousness crossing streets.

Second, prior to the inception of the stop, the officers had only surveilled Defendant from a distance and during much of the observation, their view of the bag was most likely obstructed as demonstrated to the Court during the hearing. Sergeant Schwartz observed Defendant from at least forty feet away and during most of the observation Defendant's right side upon which the bag rested was furthest from Sergeant Schwartz and, as Defendant turned his gaze to look at the marked patrol car, Defendant clutched at the bag such that Defendant's arm obscured the bag. Officers

---

[14] The Court accepts the Government's contention that Defendant was in a high-crime area but finds that this fact is not particularly helpful for the Government. First, the fact that Defendant was in a high-crime area is not an "individualized fact[] specific to [defendant]." *Freeman*, 735 F.3d at 101. Second, the fact that one is in a high-crime area does not, without more, suggest that nervousness is the result of one's own criminal behavior as opposed to feared criminal behavior by others in the high-crime area of which one could be a victim.

Greene and Fico initially had a clear view of the bag from six or seven car lengths or "a little closer," Officer Greene continued to observe Defendant as he walked through the parking lot but his view of the bag was obstructed by Defendant's body and the officers were separated from Defendant by a sidewalk, parked cars, and a fence. The limited close-up and unobstructed view of the cross-body bag limits the "objective facts" available regarding the bag and its perceived contents.

Third, the Court is not convinced that any officer saw a clear outline or telltale "bulge" in the bag prior to the stop. Observation of such an outline can significantly contribute to a finding of reasonable suspicion. *See, e.g.*, *United States v. Rios,* No. 09 CR 369, 2009 WL 2602202, at *2 (E.D.N.Y. Aug. 24, 2009) (denying motion to suppress where defendant's descent from bicycle caused his jeans to "tighten[ ] up," and officer "observed the L-shape outline of a gun" in defendant's pocket); *United States v. Monroe,* No. 08 CR 609, 2009 WL 3614521, at *4 (E.D.N.Y. Nov. 2, 2009) (denying motion to suppress where defendant turned his body in a way that revealed an L-shaped bulge in his back pocket); *United States v. Grant,* No. 07 CR 729, 2008 WL 897805, at *5 (E.D.N.Y. Mar. 31, 2008) ("The bulge here was not just an undefined heavy object; the distinct shape of a handgun could be made out beneath the defendant's T-shirt and shorts.")

Officer Greene admitted that he did not see any outline before he reached for the bag after the inception of the stop. Sergeant Schwartz's initial testimony emphasized the weight of the object in the bag. He seemed to add, as an afterthought to his initial answer "the shape of it, too," without giving any specifics as to what the shape was (Tr. at 17), and then, when asked on redirect, after much prodding, why he believed it was a weapon as opposed to another heavy object he testified "The shape of the object, the way it weighted down within the bag and was freely moving within the bag." (Tr. at 41.) This statement seems to again emphasize the weight, rather than a distinctive

shape. Finally, upon re-cross, when the Court asked Sergeant Schwartz to describe the outline he saw did Sergeant Schwartz state "It appeared to be like --I would want to say like a seven, you could see it was higher on one end what appeared to be a barrel protruding from it." (Tr. at 47.) That Sergeant Schwartz only detailed any distinctive outline at this point—when the Court asked Sergeant Schwartz to describe what if any outline he saw—leads the Court to question whether Sergeant Schwartz's belief that Defendant had a gun was based on having seen such an outline. *See Jackson*, 2015 WL 4557401, at \*6, \*11 (noting that officer's testimony that he saw "slight bulge" when suspect pulled up his jacket to show his waistband while possibly holding elbows to his side only "in response to a specific question, and he left out the bulge when he was given an opportunity to describe all of the things about Jackson's behavior that raised suspicion of a weapon, even though he had previously answered a leading question in the affirmative" appeared to be "an afterthought" supported suppression).

Even if Sergeant Schwartz did observe a distinctive outline, the Court finds it significant that when questioned as to whether the heavy object could have been something other than a weapon, both Sergeant Schwartz and Officer Greene admitted that it could have been something else and their answers regarding why they believed it was a weapon related to Defendant's nervousness, not any outline or physical characteristic of the "heavy object" other than its weight. Additionally, no other officer, who at times observed the Defendant from a closer distance testified to seeing any outline of a weapon. Similarly, neither the Complaint, nor the YPD Incident Report mention that any officer saw an outline of a weapon before Officer Greene approached Defendant.

Fourth, the officers did not testify that anything about their training made them particularly attuned to the likelihood that a weighted item in the cross-body bag was a gun. To the extent that Sergeant Schwartz testified that he interpreted Defendant's securing of the bag while turning his

gaze to observe the patrol car was a "situational awareness" thing based on his own routine use of a weapon, Sergeant Schwartz admitted that he does not carry a weapon in a cross-body bag. Because Defendant's weapon was in a cross-body bag, this case is distinguishable from the many cases in which officers based their interpretation of a defendant's adjustment of a waistband or hiking up of pants as indicative of the presence of a weapon in the waistband, method of carrying weapons that is very common and with which officers often have personal experience. *See, e.g.*, *United States v. Padilla*, 548 F. 3d 179 (2d Cir. 2008) (denying motion to suppress based in part on officer's testimony that he saw defendant adjust something in the center of his waistband in a manner "consistent with the adjustment of a gun lodged in one's waistband" but *not* "consistent with any innocent explanation" based on the officer's experience in making nearly ten arrests of suspects carrying firearms in their waistbands and how his colleagues adjusted their waistbands when carrying firearms.) Unlike waistbands, which are a known place for individuals to carry weapons, no evidence was introduced suggesting that cross-body bags are typically used to carry weapons.

Finally, during the hearing both Sergeant Schwartz and Officer Green demonstrated how Defendant wore the cross-body bag with the weapon inside and the Court did not observe anything remarkable. During the demonstrations at the hearing, the Court observed no visible signs or indications—such as the shape of a pistol, revolver, or a seven—and those demonstrations did not include the scarf that Officer Greene testified was also found in the bag, which could have further obscured the shape of the weapon on the day of Defendant's arrest. *Contra Padilla* 548 F. 3d 179 (denying suppression motion where magistrate judge twice requested that the officer demonstrate how defendant adjusted his waistband at the suppression hearing and characterized it as a

"distinctive gripping motion, as if holding and adjusting (first up and then down) and something comparable in size, shape, and heft to a handgun").

In summary, the Court finds that the Government has failed to show by a preponderance of the evidence that individually and collectively the YPD officers had reasonable suspicion to stop Defendant. "Admittedly, this is a close call. But to hold otherwise would be to eviscerate any objective criteria from the concept of 'reasonable suspicion' and replace it with an entirely subjective standard predicated entirely upon the conclusions of the individual officer. Simply put, such a subjective basis for effecting a *Terry* stop is not what the Fourth Amendment demands." *United States v. Doughty*, No. 08 CR. 375 (RPP), 2008 WL 4308123, at *6 (S.D.N.Y. Sept. 19, 2008) (rejecting government contention that defendant's allegedly suspicious "demeanor" while in a high-crime area at night as the police approached him in an unmarked van).

***

Having determined that the officers lacked reasonable suspicion for the stop, any tangible or testimonial evidence obtained thereafter must be suppressed. *See Murray v. United States*, 487 U.S. 533, 536-537 (1988) (explaining that the exclusionary rule "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search"); *Taylor v. Alabama*, 457 U.S. 687, 690-91 (1982) (suppressing a confession made six hours after an unlawful arrest because there were no intervening circumstances); *Brown v. Illinois*, 422 U.S. 590, 604-05 (1975) (suppressing confession obtained two hours after an illegal arrest and after defendant was mirandized because there was "no intervening event of significance").

**CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 34.

SO ORDERED.

Dated:   April 28, 2021
        White Plains, New York

_____

NELSON S. ROMÁN
United States District Judge
